**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| *In re:* | § | |
| | § | |
| **Austin David Seitz and** | § | **Case No. 05-59471-399** |
| **Cherie Ann Seitz,** | § | |
| | § | **Chapter 7** |
| **Debtors.** | § | |
| _____ | § | |
| | § | |
| **Charles W. Riske,** | § | |
| **Trustee in Bankruptcy,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adv. Proc. No. 07-4452-705** |
| | § | |
| **The David Austin Seitz Irrevocable Trust,** | § | **[Related to Docket ##23 & 58]** |
| **David H. Seitz, Trustee, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM OPINION</u>

On October 14, 2005 (the "Petition Date"), the husband and wife debtors, Austin David Seitz ("Austin") and Cherie Ann Seitz (together, the "Debtors"), commenced the above-referenced main bankruptcy case (the "Main Case") by filing a joint petition [Main Case Docket #1] for relief pursuant to chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"[1]).  On October 12, 2007, the chapter 7 trustee (the "Trustee") filed a complaint commencing the above-referenced adversary proceeding (the "Adversary Proceeding") [Adversary Proceeding Docket[2] #1], seeking avoidance of certain allegedly

---

[1]All referenced hereinafter to "section(s)" or "§(§)" shall refer to the referenced section(s) of the Bankruptcy Code.

[2]All docket references hereinafter shall refer to the document at the referenced docket number in the Adversary Proceeding.

fraudulent transfers and the recovery of the value of the property transferred. On February 27, 2008, the Trustee filed a First Amended Complaint (the "Complaint") [Docket #23]. One of the Defendants, The David Austin Seitz Irrevocable Trust, David H. Seitz, Trustee (the "Seitz Trust Defendant") did not file an answer or otherwise respond, and did not appear at any hearing or at the trial.[3]  The remaining Defendants[4] (also known as the "BRG Defendants," *see* Part II of this Order) timely filed a joint Answer [Docket #29]. On August 20, 2008, the Adversary Proceeding was tried before the Court. Upon consideration of all pleadings, arguments, admissible evidence, and applicable law, the Court will render judgment in favor of the Plaintiff in the amount of $630,175.00, as set forth below.

## I. PRELIMINARY MATTER

On the date of the trial, the Trustee filed a Motion for Judgment on the Pleadings (the "MJP") [Docket #58] under Federal Rule of Civil Procedure 12 against the non-responsive Seitz Trust Defendant. However, the last-minute filing of the MJP placed the BRG Defendants in the position of having to evaluate and respond on-the-fly to the MJP and possible resulting prejudice, and also placed the Court in the position of having to review a substantive, significant motion in the few minutes prior to trial. As such, a continuance would have been required to allow the remaining Defendants and the Court itself to properly absorb the MJP. Given that under the Rule, it is the burden of the movant of such a motion to file it "early enough not to delay trial," the Court will **FIND** that the MJP

---

[3]David H. Seitz, in his capacity as an individual, did appear at trial pursuant to a subpoena and gave testimony.

[4]The remaining Defendants are Southern Boys Restaurant Group, Inc., Bandana's Missouri, L.L.C., Gravois Bar-B-Q Holding, L.L.C., and Bandana's Illinois, Inc.  Each of these entities did business as a "Bandana's Bar-B-Q."

was not filed timely, will **HOLD** that entertaining the untimely MJP is not proper, and will

**DENY** the MJP as untimely but without prejudice as to any issue of law or fact therein.

## II.  FACTS

In 1996, Austin, his father, David H. Seitz ("David"), and his brother, Jonathan Seitz

("Jonathan"), together founded several restaurant businesses, which were operated

through three Missouri corporations and an Illinois corporation (collectively referred to as

the "Bandana's Restaurant Group" ("BRG," and as parties to this Adversary Proceeding,

the "BRG Defendants")).  BRG was owned by six equity interest holders:  Austin, David,

Jonathan, Rick White, John David Rimmer, and the Mark J. Touey Revocable Trust.  Austin

held a twenty percent equity interest and served as an employee and vice president.  By

2003, Austin had grown bored in his relationship with BRG and decided that he wanted to

strike out on his own.  However, because he did not have the liquidity needed to sufficiently

capitalize his planned new restaurant businesses, Austin approached his father about

selling one-half of his twenty percent interest to the other BRG equity holders[5] (collectively,

the "2003 Buyers"), to raise the capital he needed.  On April 23, 2003, the 2003 Buyers and

Austin executed a purchase agreement (the "2003 Purchase Agreement"), whereby the

2003 Buyers agreed to purchase one-half of Austin's interest in BRG (a ten percent

interest) for approximately $1 million, with $785,688.00 of that amount structured in an

upfront payout of approximately $250,000.00 and additional payouts structured over the

next three years, and the remainder of the $1 million being in the form of the assumption

or retirement of certain business debts owed by Austin.  This sale (the "First Sale") also

_____

[5]The other BRG equity owners were David, Jonathan, Rick White and John D.
Rimmer, and the Mark J. Touey Revocable Trust.

required that Austin resign his position as an employee and officer and to transfer his remaining ten percent interest (the "Remaining Interest") to an irrevocable trust with a spendthrift provision (the "Trust"). David was named trustee of the Trust, and Austin, his wife, and their minor children were named as beneficiaries.

Austin took the $250,000.00 payment and invested it into several restaurant businesses. However, over the course of the next two years, Austin's ventures failed and were closed. By early 2005, Austin was out of money but attempting to get off the ground yet another restaurant–a "Johnny Rocket's" hamburger shoppe in Kirkwood, Missouri. Although the initial capitalization for the Johnny Rocket's was provided by two investors, by the time the restaurant was scheduled to open, Austin needed to inject a $250,000.00 capital infusion into the business. So again, Austin approached his father for help, seeking to sell the Remaining Interest to BRG and have the redemption proceeds distributed to him (that is, to Austin). When David initially advised his son that the BRG equity holders were not interested in a buyback, Austin then solicited and obtained an offer from a non-insider, Rod Thomas. On February 28, 2005, Thomas offered to buy one-half of the Remaining Interest (a five percent interest in BRG) for $160,000.00, and to extend a $100,000.00 loan to Austin that would be collateralized by the final remaining five percent interest and further backed by personal guarantees. Upon being advised of the Thomas offer, BRG exercised its right of first refusal and the BRG Defendants offered to buy the Remaining Interest in its entirety for $260,000.00. This transaction (the "Second Sale") was completed pursuant to a purchase agreement dated March 4, 2005 (the "2005 Purchase Agreement").

In September 2006, approximately eighteen months after the Second Sale, BRG was sold to Park Ridge Midwest Restaurant, Inc. At trial, the Trustee alleged that, pursuant

to this sale (the "Third Sale"), the Remaining Interest would have been worth $1,650,000.00.[6]

### III. ANALYSIS

The Trustee now challenges as fraudulent both the transfer of the Remaining Interest to the Trust pursuant to the First Sale, as well as the transfer of that interest to the BRG Defendants pursuant to the Second Sale. The Court will consider each transfer in turn, first addressing the two avoidance counts, then addressing the two recovery counts.

### A. Count I:
### Avoidance of the Transfer of the Remaining Interest to the Trust as a Transfer Made with the Actual Intent to Hinder or Delay Creditors in Violation of State Fraudulent Transfer Law.

The Trustee brings Count I of the Complaint pursuant to his strong arm power under Bankruptcy Code § 544, which provides that ". . . the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b). Using this power, the Trustee seeks avoidance of Austin's transfer of the Remaining Interest to the Trust pursuant to the First Sale as a transfer made with the actual intent of the transferor to hinder or delay creditors in violation of Missouri state law.

Missouri law provides that:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the

---

[6]This figure is approximately $850,000.00 less than than the $2.5 million value that the Trustee originally alleged in his Complaint.

obligation:

> (1)    With actual intent to hinder, delay, or defraud any
> creditor of the debtor . . .

Mo. Rev. Stat. § 428.024.1(1). If the "debtor"–the transferor–under this state law provision

then becomes a "debtor" under the Bankruptcy Code before the expiration of the statute

of limitations on the state law cause of action for avoidance of a fraudulent transfer, the

trustee may pursue avoidance of such a transfer under Bankruptcy Code § 544.[7]

Direct evidence of actual intent (that is, an admission by the transferor as to his

subjective intent) is rarely available. *Citizens Nat'l Bank of Maryville v. Cook*, 857 S.W.2d

502, 505 (Mo. Ct. App. 1993)(citing *Lindell Trust Co. v. Commonwealth Land Title Ins. Co.*,

611 S.W.2d 283, 286 (Mo. Ct. App. 1980)).[8]  Therefore, the law allows the trier of fact to

---

[7]Both federal and state law statutes of limitations apply in determining whether a fraudulent transfer action commenced by a trustee asserting his strong-arm powers under Bankruptcy Code § 544(b) is time-barred.

First, the state law statute of limitations governing a fraudulent transfer action must not have run as of the petition date. Here, the transfer to the Trust occurred on April 23, 2003, and the Petition Date was October 14, 2005. Therefore, the applicable four-year state law statute of limitations, *see* Mo. Rev. Stat. § 428.049(1), had not expired as of the Petition Date.   The Court notes that the Defendants argued that the Trustee is time-barred from bringing the fraudulent transfer action as to the First Sale, arguing that the statute of limitations had run under the federal bankruptcy fraudulent transfer provision, Bankruptcy Code § 548(a)(1) (Defs.' Trial Brief at 12-13 [Docket #46].)  However, the Trustee does not challenge the First Sale under the federal bankruptcy law fraudulent transfer statute; he maintains his action pursuant to state law.

Second, pursuant to Bankruptcy Code § 546(a), a trustee generally must commence a fraudulent transfer action, pursuant to his strong-arm powers, no later than two years after the petition date.  11 U.S.C. § 546(a)(1)(A).  This requirement also was satisfied, as the Trustee filed this Adversary Proceeding on October 12, 2007, two days shy of two years after the Petition Date.

[8]The Missouri fraudulent transfer statute (an enactment of the Uniform Fraudulent Transfer Act (the "UFTA")) was enacted August 28, 1992, and consists of Mo. Rev. Stat. §§ 428.005 - 428.059.  Prior to the enactment of the UFTA, the Missouri fraudulent transfer law was codified at the substantively similar Mo. Rev. Stat. § 428.020.  Much of

consider the presence of certain "badges of fraud" in determining whether the transferor had the requisite actual intent. *Id.* As a result, actual intent may be objectively established through circumstantial evidence, regardless of what the debtor may claim about his subjective intent.

The badges of fraud include whether:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mo Rev. Stat. § 428.024.2. The presence of one badge of fraud alone does not support a finding of actual intent to defraud; however, the presence of several indicia of fraud may give rise to a strong inference of fraud. *Bueneman v. Zykan*, 52 S.W.3d 49, 54 (Mo. App. Ct. 2001). Intent to defraud must be established by clear and convincing evidence. *Taylor*

the pre-UFTA case law remains applicable on the issues related to fraudulent transfers, including the application of the badges of fraud, and often is cited without distinction between pre-UFTA and UFTA circumstances.

*v. Clark*, 140 S.W.3d 242, 251 (Mo. Ct. App. 2004)(citing *First Home Sav. Bank v. C & L Farms, Inc.*, 974 S.W.2d 621, 627 (Mo. Ct. App. 1998)).

**1.    Direct evidence establishes that, in making the transfer to the Trust, Austin had the actual intent to hinder or delay his creditors.**

This case appears to be one of those rare instances in which there is direct evidence of the debtor's intent to defraud.  Although Austin responded "no" to the BRG Defendants' deposition question (which was posed to Austin in tell-tale, red-flag "legal-ese") as to whether he had actual intent to defraud when he made the transfer to the Trust, Austin admitted to such intent.  He stated both in deposition and at trial that he knew that the reason the Trust transfer requirement was included as a term of the Second Sale was for the 2003 Buyers' and BRG's protection, to prevent the Remaining Interest from falling into the hands of Austin's creditors.  And, knowing this purpose, Austin made the transfer.  As such, Austin admitted that he had shared in the 2003 Buyers' intent to remove assets from the reach of his creditors.  It is not relevant that he may have had a different motivation in doing so than the 2003 Buyers had.

The Court does not accept the notion, promoted by the BRG Defendants, that Austin lacked the requisite intent to hinder, delay or fraud because the transfer was designed for Austin's tax or estate planning purposes.  This alternate purpose for the transfer lacks any color of credibility.  No other assets were ever transferred to the Trust, no tax or estate planner was consulted during negotiations by any party to the 2003 Purchase Agreement, and there are no other facts that support the claim that the Trust was established for legitimate tax or estate planning purposes. Austin did not even appear to know that his own children (presumably, his heirs) were beneficiaries to the Trust until advised of this fact by

opposing counsel during 2008 deposition.    It is clear that the Trust was established and functioned for one purpose only: to shield the Remaining Interest from seizure by creditors.

The Court also rejects the "Document Made Me Do It" defense to defeat a finding of admission of intent.  Under this theory, despite his admission to knowing the purpose of the provision, Austin could not have possessed actual intent to hinder, delay or defraud because, in making the transfer, he merely was acting pursuant to the 2003 Purchase Agreement.  That is, Austin simply was performing his legal obligation under the contract in making the transfer and cannot be found to have acted with the requisite intent.  This argument completely ignores Austin's active adoption of the 2003 Buyer's intent.  Austin agreed to the terms of the 2003 Purchase Agreement knowing the purpose of the transfer provision and then acted to effect that purpose by transferring the Remaining Interest.

As such, the Court is satisfied that, in admitting that he knew the true purpose of the transfer provision and certainly being aware of his own financial condition at the time, Austin admitted to possessing the actual intent to hinder or delay his creditors at the time that he made the transfer of the Remaining Interest to the Trust.

The Court also notes that it need not, and does not, opine as to whether Austin possessed the actual intent to *defraud* his creditors (a third, alternate element of Mo. Rev. Stat. § 428.039.1(1)).  The Court is satisfied that Austin, in acceding to the 2003 Buyers' demand that he shelter the Remaining Interest, adopted their purpose for the transfer provision and therefore intended to hinder or delay his creditors–and that he did so for immediate gratification in the form of an instant $260,000.00 from the Second Sale.

As such, the Court will **FIND** that clear and convincing direct evidence exists establishing Austin's actual intent to hinder or delay his creditors by transferring the

Remaining Interest to the Trust, will **HOLD** that the transfer was a fraudulent transfer under

Missouri state law and that avoidance of the transfer under Bankruptcy Code § 544 is

proper, and will **ORDER** that the transfer be avoided.

**2.    Circumstantial evidence and the badges of fraud analysis establish that, in making the transfer to the Trust, Austin had the actual intent to hinder or delay his creditors.**

In addition and in the alternative, even if Austin's admissions at deposition and trial

do not constitute sufficient evidence to establish the requisite intent, the presence of

multiple badges establishes by circumstantial evidence that Austin had the requisite intent

to hinder or delay his creditors.

***Badge 2.***   The evidence established that Austin retained control of the Remaining

Interest after the transfer.   The actions of both the trustee, David, and the grantor, Austin,

support this finding.

David functioned as nothing more than a rubberstamp for Austin's desired treatment

of the Remaining Interest.   When Austin asked his father in 2005 to sell the Remaining

Interest in the Trust, David used no independent judgment in determining the

appropriateness of such a sale–either as to the reasonableness of the sale price sought

by David or to the issue of whether such a sale was in the best interests of any or all of the

beneficiaries.   He obtained no valuation to determine whether the proposed sale price

represented a fair price.   And he appears to have deliberately abdicated or ignored his

fiduciary duty to the beneficiaries of the Trust.   In deposition, he admitted that: (1) when

Austin initially approached him to sell the Trust res, he did not think that such a sale was

in Austin's best interest, but that he eventually gave in–not because he had a substantively

different assessment of whether the sale was in Austin's best interests, but because Austin hounded him about it; and (2) he administered the Trust under the assumption that the best interests of Austin were necessarily best interests of the other beneficiaries, with no consideration given to any distinction of interests.

Likewise, Austin regarded the Remaining Interest as his own personal property. As he stated in his deposition when explaining how he planned to meet his Johnny Rocket's obligations in 2005: "And my only real asset at that time was the, that trust . . ." (Austin Depo. at 20-21, ll. 25-1). At trial, he confirmed that, in his view, the only asset he had left in 2005 was the Remaining Interest and that, indeed, he had considered the Remaining Interest to be his personal property. The belief was so profound that in his Schedules of Assets and Liabilities filed in the Main Case, Austin represented that he–not the Trust–had sold the Remaining Interest pursuant to the Second Sale, and similarly advised the Trustee of this at the meeting of creditors held in the Main Case. Further consistent with this belief, Austin alone marketed the Remaining Interest to Thomas and obtained an offer, and he alone received the proceeds of the Second Sale.

Therefore, regardless of the fact that the Trust res was *not* his personal asset and regardless of the fact that he was *not* the sole beneficiary to the Trust, Austin viewed the Trust as his personal money tap by which he could solve his business liquidity problems–a view of which David, as trustee of the Trust, did nothing to disabuse him. There is no question in the Court's mind that the Trust was created merely to superficially satisfy the demands of the 2003 Buyer and that neither Austin nor his father ever intended to treat the transfer of the Remaining Interest to the Trust as having truly alienated Austin's personal ownership interest in the res. Austin had as much effective control over the Remaining

Interest post-transfer as he had pre-transfer.

**Badge 8.**  The transfer of the Remaining Interest was not made for reasonably equivalent value.  The BRG Defendants concede and, in fact, argue that the entire First Sale was not for reasonably equivalent value, and the Trust (which did not respond to the Complaint) does not contest this position.  And the Court accepts this position as true–especially in light of the insider nature of the sale and the lack of any indication of the sale being an arms' length transaction.  As such, the transfer of the Remaining Interest, which was part of the First Sale, cannot be found to have been for reasonably equivalent value.  No construction of the facts can prop up the notion that Austin received reasonably equivalent value for the transfer to the Trust of the Remaining Interest for which he received no separate consideration aside from the agreement of the 2003 Buyers to purchase his other ten percent interest (for which he received less than reasonably equivalent value).

**Badge 9.**  It is an indicia of fraud if a debtor was insolvent or became insolvent shortly after the transfer was made or the obligation.  Missouri state law provides that a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair market valuation, or if the debtor is generally not paying his debts as they become due.  Mo. Rev. Stat. § 428.014(1),(2).

There is no dispute that Austin was in self-induced, serious financial trouble by 2003.  As Austin summarized, he "spent a lot of money, borrowed a lot of money.  You know, just spent more than I had."  (Austin Depo. at 19, ll. 5-7); (*see also* David Depo. at 22, l. 22.)  He conceded that his money management incompetency had "caused a lot of problems,

a lot of turmoil" with the other BRG equity holders, (Austin Depo. at 19, l.7), and resulted in the 2003 Buyers' demand for the transfer of the Remaining Interest to the Trust. At trial, he admitted that prior to the First Sale, he did not have sufficient assets to meet his obligations related to his new restaurant ventures and that his twenty percent interest in BRG was his only unencumbered asset of significance. He had no stocks, 401(k) or IRAs, or real estate, and he owed federal income tax debt for tax years 2002 and 2003, and carried numerous personal debts (including business debts to BRG vendors on which he was personally liable). And, most importantly, when asked if he was "having trouble . . . just paying all your obligations" as of the time of the First Sale, Austin answered affirmatively. (Austin Depo. at 20, ll. 9-10.) Even in the depths of his financial incompetence, Austin certainly would have known whether he was generally paying his debts. The Court believes his frank admission that he was "having trouble" doing this–especially in light of the remainder of the evidence suggesting that Austin's financial troubles were serious and immediate.[9] Therefore, the Court finds that Austin was insolvent as the date of the First Sale.

Accordingly, given the presence of several badges of fraud and the other circumstances surrounding the transfer to the Trust, the Court will **FIND** that clear and convincing circumstantial evidence exists establishing Austin's actual intent to hinder or delay his creditors by transferring the Remaining Interest to the Trust, will **HOLD** that the transfer was a fraudulent transfer under state law and that avoidance of the transfer under Bankruptcy Code § 544 is proper, and will **ORDER** that the transfer be avoided.

---

[9]By this time, Austin was having trouble paying his obligations when they became due and had an income tax liability of $150,000.00.

**B.  Count III:**

**Avoidance of the Transfer of the Remaining Interest to the BRG Defendants as a Constructively Fraudulent Transfer under Bankruptcy Code § 548(a)(1).**

As a result of the avoidance of the transfer to the Trust, the Remaining Interest was property of Austin, not the Trust, as of the date of the Second Sale.  On this premise, in Count III the Trustee seeks to avoid Austin's transfer of the Remaining Interest to the BRG Defendants pursuant to the Second Sale as a constructively fraudulent transfer[10] under federal bankruptcy law.[11]

The Bankruptcy Code[12] provides that

---

[10]Like under UFTA and most state laws, federal bankruptcy law prohibits both fraudulent transfers made with actual intent to hinder, delay or defraud (such as the basis under Missouri state law alleged in Count I) under Bankruptcy Code § 548(a)(1)(A), as well as constructively fraudulent transfers under Bankruptcy Code § 548(a)(1)(B).  The Complaint appears to allege in the alternative that the transfer made pursuant to the Second Sale was committed with actual and constructive intent.  However, the Trustee's Trial Brief and the arguments made at trial suggest that the Trustee's request for avoidance rests on an allegation of a constructively fraudulent transfer.  Accordingly, the Court's analysis will treat Count III as a request for avoidance based on the transfer being a constructively fraudulent transfer under Bankruptcy Code § 548(a)(1)(A).

[11]In the Complaint, the Trustee captions Count III "Avoidance of Transfer to Trust as Fraudulent Pursuant to 11 U.S.C. Section 548."  Presumably, the Trustee meant "Avoidance of Transfer *from* Trust as Fraudulent Pursuant to 11 U.S.C. Section 548."  However, regardless of this apparently inadvertent choice of preposition, it is clear from the allegations made within the Count III paragraphs that the Trustee is challenging the transfer made pursuant to the Second Sale (from the Trust to the Second Sale buyers).  And the BRG Defendants did not argue that they were prejudiced from being able to defend against the claim in Count III as a result of the wording in the caption.

[12]The Main Case was filed prior to the effective date of the amendments to the Bankruptcy Code effected by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Therefore, the cited Bankruptcy Code sections are the pre-BAPCPA versions.

> [t]he trustee may avoid any transfer of an interest of the debtor in property . . . that was made . . . on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily– . . . (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . . and (ii)(I) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . .

11 U.S.C. § 548(a)(1)(A).[13]   An individual is "insolvent" for purposes of the Bankruptcy Code if his "financial condition [is] such that the sum of [his] debts is greater than all of [his] property, at a fair market value, exclusive of–(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such [individual's] creditors; and (ii) property that may be exempted from property of the estate . . ." 11 U.S.C. § 101(32)(A).

***Reasonably Equivalent Value Prong.***  As to the first prong, the Trustee claims that the Second Sale's purchase price of $260,000.00 for the Remaining Interest was not reasonably equivalent value.[14]   The BRG Defendants respond that the purchase price represented reasonably equivalent value because they, as the Second Sale purchasers, "matched" the offer made by Thomas, a non-insider whose offer therefore presumably was the result of arm's length negotiations that produced a fair market price (and thus represented reasonably equivalent value).

-------

[13]Pursuant to Bankruptcy Code § 546(a), the Trustee must have commenced this Adversary Proceeding no later than two years after the Petition Date of October 14, 2005–which he did, by filing the Complaint on October 12, 2007.

[14]Although the Bankruptcy Code does not define "reasonably equivalent value," fair market value "is the benchmark for determining reasonably equivalent value outside of foreclosure." *Linquist v. JNG Corp. (In re Lindell)*, 334 B.R. 249, 244 (Bankr. D. Minn. 2005)(citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994)).  Whether reasonably equivalent value has been given is a question of fact, *id.* (citing *Jacoway v. Anderson (In re Ozark Restaurant Equip. Co.)*, 850 F.2d 342, 344 (8th Cir. 1988)), and the trier of fact must examine the totality of the circumstances in making this factual determination, *id.*

There are two principal problems with the BRG Defendants' argument.  First, the Agreement and Release (the "Agreement and Release") attached to the 2005 Purchase Agreement provides that: "**[t]he purchase price was arrived at arbitrarily and may not represent the fair market value of the equity and may even be below the fair market value of the equity.**"  The Agreement and Release was drafted by the BRG Defendants' counsel and was signed by all parties.[15]  As such, the BRG Defendants conceded that the $260,000.00 sale price does not reflect the parties' efforts to reach a fair value, and that the purchase price was not based on a valuation or even on a reliable "guess."  It was based on arbitrary considerations (which, in reality, meant that it is based on "whatever Austin minimally needed to fund his Johnny Rocket's venture").  This admission seriously calls into question the BRG Defendants' currently convenient position that the purchase price represented reasonably equivalent value.

Second, the BRG Defendants' argument rests on a mischaracterization of how the Thomas offer was reached.  Nothing in the circumstances surrounding the negotiations suggests that the price represents the end-result of an arms' length process.  Austin admitted that he approached Thomas, hat-in-hand, advising Thomas of his need for $260,000.00 and inquiring as to whether Thomas would be interested in purchasing the Remaining Interest.  Austin's openness about his financial straits (a tactic which generally defies both business and common sense) in approaching Thomas–a sophisticated businessman–made Thomas's offer more equivalent to a fire-sale price than a price

---

[15]The version of the Agreement and Release submitted as a trial exhibit was not signed by the parties.  However, no party objected to its admission and presumably it was signed by the parties and reflects the understanding among the parties.

reflecting reasonably equivalent value.  The fact that a 2004 valuation of BRG[16] was provided to Thomas for his review does not offset the fact that Austin showed his hand in terms of how low an offer his circumstances most likely would force him to entertain.  By all appearances as well as Austin's own testimony, the Thomas offer was based on how much Austin needed to meet his capital obligations in the Johnny Rocket's venture, not on how much the stock might really have been worth.  As such, the BRG Defendants' willingness to approximately match that same price does not mean that the matched offer any more reflected reasonably equivalent value; it means that both offers were steeply discounted by Austin's known personal desperation.

Even setting aside the important dynamic that Austin's beggary brought into the negotiations, the Court still finds the $260,000 sale price to be well below any figure that reflected reasonably equivalent value.  First, the evidence established that a mere eighteen months after the Second Sale, the Remaining Interest was worth more than a million and a half dollars pursuant to the Third Sale.[17]  Even though BRG's value increased from the time of the Second Sale to that of the Third Sale, the increase was modest compared to the huge difference in the values of the Remaining Interest as reflected in the two sales.[18]

---

[16]*See* Exhibit "BB" (Appraisal by Gary Schroeder on 9/1/2004) (showing a one hundred percent ownership value of the company under the Market Approach of $8,600,000.00 – $8,800,000.00 (p. 51) and the Income Approach of $8,400,000.00 (p. 65) with no discounts).

[17]The Court finds the purchase price of the Third Sale and its resulting values reflected reasonably  equivalent value without a minority interest discount in September 2006.

[18]The minority position discount that would have applied in 2006 to justify a sale price of $260,000.00 would require the September 2006 sale price of a ten percent interest, $1,650,000.00, to undergo a discount of over eighty-four percent.

In addition, the BRG Defendants' appraisal shows a company value of approximately $8,500,000.00 in September 2004 while the Plaintiff's appraisal shows a value of $9,791,389.00 in March 2005. Utilizing either of these appraisals, the Court would have to adopt a minority and marketability discount of seventy to seventy-three and a half percent–an extraordinarily high discount rate that is unsupported by the evidence–to find the $260,000.00 was the reasonably equivalent value of the Remaining Interest in March 2005. These facts convince the Court that the Second Sale purchase price of $260,000–or any number close to it–could not have reflected reasonably equivalent value in 2005.

**Insolvency Prong.** If the debtor is not insolvent, or rendered insolvent, by the sale of an asset for less than reasonably equivalent value, then the debtor's decision to accept considerably less than property is worth–for whatever reason–generally does not make the sale a constructively fraudulent transfer. As long as creditors are not disadvantaged by the low sale price (because the debtor otherwise is sufficiently liquid to cover his debts), then the debtor is free to sell (or, more specifically, undersell) his property for whatever price he likes. However, when the debtor is insolvent or rendered insolvent by the sale of his property for less than reasonably equivalent value, the decision to accept such a price will make the transfer constructively fraudulent.

Even if Austin was not already insolvent immediately prior to the Second Sale,[19] he was rendered insolvent as a result of the transfer. According to Austin, as of the Second Sale, the Remaining Interest was his last remaining unencumbered asset that he could tap

---

[19]Austin admitted insolvency at trial, testifying that, as of the Second Sale, his debts, as a result of Johnny Rockets and past income taxes, were greater than his assets.

to fund his obligations related to the Johnny Rocket's restaurant. Austin had numerous personal and business debts and obligations, and significant delinquent federal income tax debts. Assuming that he was not insolvent prior to the Second Sale (because of the true fair market value of the Remaining Interest), the lowball Second Sale purchase price certainly moved Austin's assets-to-debt ratio from black to red, as $260,000.00–his last remaining asset of any significance–was less than his outstanding debts.[20] Accordingly, the Court is satisfied that the insolvency prong has been met.

Therefore, the Court will **FIND** that the Second Sale was not for reasonably equivalent value and Austin was insolvent at the time of the transfer, will **HOLD** that the Second Sale was a constructively fraudulent transfer and subject to avoidance pursuant to Bankruptcy Code § 548, and will **ORDER** that the transfer be avoided.

### C. Count II: Recovery from the Trust of the Value of Austin's Ten Percent Interest.

The Trustee seeks relief in the form of recovery from the Trust for the value of Austin's ten percent interest that he transferred to the Trust pursuant to the now-avoided portion of the First Sale.

Bankruptcy Code § 550 provides that

> to the extent that a transfer is avoided under section 544 . . . [or] 548 . . . the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from–(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

---

[20]Only seven months after the Second Sale, Austin filed for bankruptcy relief, representing that he had $1,196,528.20 in assets and $1,608,813.52 in debts.

11 U.S.C. § 550(a).  Judgment against the Trust for the recovery of the value of the Remaining Interest would be appropriate, if the Second Sale had not occurred and the transferred property were still in the Trust, or if recovery from the avoidance of the Second Sale were not available because the BRG Defendants were good faith purchasers under § 550(b).[21]  Under such circumstances, recovery from the Trust would be proper because the transfer to the Trust would have resulted in harm to Austin's creditors and equity would demand such a judgment.  However, those are not the circumstances here.  In addition to the futility of such a judgment (the Trust has no res), the Court will not hold the Trust liable for the value of the Remaining Interest because the transfer, once avoided, had no prejudicial effect on the creditors.  The value of the property was not removed from the creditors' reach by this avoided transfer; rather, the real harm to creditors resulted from the second transfer of the interest, from Austin to the BRG Defendants.

### D.  Count IV: Recovery from the Second Sale Buyers for the Value of Austin's Ten Percent Interest.

The Trustee also seeks relief under Bankruptcy Code § 550(a) for a judgment entitling him to recovery from the Second Sale Buyers for the value of the ten percent interest.  However, the BRG Defendants argue that, even if the Second Sale is avoided as a constructively fraudulent transfer, the Trustee is not entitled to a judgment for recovery because the BRG Defendants were good faith transferees.

Bankruptcy Code § 550(a)(1) makes an *initial* transferee of an avoided transfer strictly liable to the estate, whether it colluded with the debtor or was an innocent and unwitting recipient.  *Leonard v. First Comm. Mortgage Co. (In re Circuit Alliance, Inc.)*, 228

---

[21]*See* Part D of this Order.

B.R. 225, 231-32 (Bankr. D. Minn. 1998).  Bankruptcy Code § 550(b) provides a safe harbor from this rule for any *immediate or mediate* transferee that takes the transferred property (a) for value, (b) in good faith, and (c) without knowledge of the voidability of the transfer.  *See, e.g., Shafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1199 (9th Cir. 1997).  However, even assuming the BRG Defendants are immediate or mediate transferees under § 550(a)(2) (as versus being initial transferees under § 550(a)(1)), they did not act in good faith.

"Good faith" is not defined by the Bankruptcy Code and is a determination made on a case-by-case basis.  *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir. 1995)(citing *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983).  In determining whether a transferee acted in good faith,

> "the courts look to whether the transferee objectively 'knew or should have known'" instead of examining the transferee's actual knowledge from a subjective standpoint.  In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.

*Id.* (internal citations omitted).  The Court finds that the transferees here were aware of sufficient facts concerning the debtor's precarious financial situation to place them on inquiry notice.  The BRG Defendants had long known of Austin's financial problems and had acted on that knowledge to their advantage in the First Sale.  When this past history is coupled with the fact that Austin's father sat among the BRG equity holders and the fire-sale terms under which Austin was willing to sell his Remaining Interest pursuant to the Second Sale, the evidence indicates that the BRG Defendants had sufficient knowledge to put them on inquiry notice as to Austin's financial circumstances. The fact that the Remaining Interest was sitting in the sham Trust at the time of the Second Sale did not

allow the BRG Defendants to assume that an inquiry into the financial circumstances of Austin (as an entity distinct from the Trust) was not necessary.  To hold otherwise would allow the BRG Defendants, who were complicit (through their equity holders) in getting the Remaining Interest fraudulently transferred to the Trust, to hide behind that transfer and benefit from their role in the fraudulent transfer.

The Court therefore will **HOLD** that the safe harbor defense is not available to the BRG Defendants and, accordingly, the Court will **FIND** that the Trustee is entitled to a judgment of recovery and will **HOLD** that entry of such judgment is proper.  The Court now must determine the value of that judgment.

The Bankruptcy Code defines neither "value" nor sets forth from what time value should be determined.  Based on the fact that both the Plaintiff and the BRG Defendants presented evidence in an attempt to establish the reasonably equivalent value of the Remaining Interest in March 2005, the parties here assumed that the Court would utilize the  Second Sale as the valuation date for purposes of the judgment.  And, in fact, "[t]ypically, courts equate 'value' with the fair market value of the subject property at the time of the transfer.  This is especially true where the property depreciated in value after the transfer, or was not in the possession of the § 550 defendant." *Joseph v. Madray (In re Brun)*, 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007)(internal citations omitted).  However, there is both case law and a strong equitable argument for allowing the trustee to recover either greater of the value of the transferred property at the transfer date or the value at the time of the recovery. *Id.*; *Langhorne v. Warmus (In re Am. Way Serv. Corp.)*, 229 B.R. 496, 530-31 (Bankr S.D. Fla. 1999); *Govaert v. B.R.E. Holding Co., Inc. (In re Blitstein)*, 105

Page 22 of  26

B.R. 133, 137 (Bankr. S.D. Fla. 1989); *see also* COLLIER ON BANKRUPTCY ¶ 550.02[3] (15th

ed. rev. 2005).  As the *In re Brun* court reasoned:

> [allowing the trustee to recover the value of the property as of
> the time of the recovery, rather than at the time of the transfer]
> makes sense.  As noted by COLLIER, this result is consistent
> with the well-established purpose of § 550, to restore the
> estate to the position it would have occupied had the property
> not been transferred.  Moreover . . . a trustee typically has the
> ability to recover the property transferred, which would allow
> the estate to benefit from any appreciation.  Section 550(e)
> demonstrates the intent of Congress that any appreciation not
> attributable to the actions of a good faith transferee inure to the
> benefit of the estate.

*In re Brun*, 360 B.R. at 674 (internal citations omitted).

The Court recognizes that the courts generally assume that the value of fraudulently

transferred property is determined as of the date of the transfer.  As implied in *In re Brun*,

this rule allows the intent of Congress (to restore to the estate the value of the property as

of the transfer) to best be effected–in any case where the property or the value of the

transferred property declines in value post-transfer (so that the valuation rule does not

punish the estate and its creditors).  However, the circumstances here are different: the

value of the transferred property increased substantially post-transfer.  To limit the Trustee

to a recovery that is capped at the transfer date value would punish the estate and its

creditors by depriving them of the appreciation in value–and allow the bad faith transferees

to capture it–on a piece of property that, pursuant to the avoidance judgment, was property

of the estate as of the Petition Date.  The plain language of § 550(a)(1), Congressional

intent, and concerns of equity persuade the Court that this is a circumstance in which value

of the transferred property is most properly determined from the date of the judgment for

recovery, not from the date of the transfer. Thus, the Court will determine the value of the

Remaining Interest as of the date of the Third Sale (September 11, 2006), not the date of the Second Sale (March 4, 2005), as the date by which the judgment value will be determined.[22]

The Third Sale was a sale of all the interests in BRG for a total sale price of $16.5 million;[23] thus, an interest of ten percent would have been $1.65 million pursuant to the Third Sale.  (The Trustee alleged that the Remaining Interest was worth $1,733,372.00. However, the Court is not satisfied as to how a ten percent interest of $16.5 million could be worth more than $1.7 million.  Given this dissatisfaction, the Court will default to basic arithmetic and assess the value of the Remaining Interest pursuant to the Third Sale to be $1.65 million.)   However, this $1.65 million includes an inflation of the value of the Remaining Interest that the Court is not willing to pass along to the Trustee in the form of a windfall.  Specifically, after the Remaining Interest was acquired by the BRG Defendants pursuant to the Second Sale, it became worth more than it would have been in the hands of Austin, where, as both parties agree, its value must have included discounts for its lessened marketability potential and as a merely minority interest.  The Court notes that, under *In re Brun*, it could allow this post-Second Sale increase in value (created by the elimination of the applicability of the marketability and minority interest discounts) to inure

_____

[22]The Court recognizes that the date of September 11, 2006 is more than twenty-five months before the date of the judgment set forth herein.  However, no evidence was presented at trial on the issue of the value of the Remaining Interest post-Third Sale.  Accordingly, the Court will use the value of as of the Third Sale as the value that best reflects the value of the Remaining Interest as of the entry of this judgment.

[23]The Court notes that this price included a control premium, as well as a financial statement entry of over $11.1 million in goodwill, as noted in the 2007 consolidated financial statement.

to the benefit of the estate and its creditors, rather than backing out these discounts from the $1.65 million.  However, the Court does not believe that, as a matter of equity, this is necessary.

Appraisers for both parties offered evidence as to the appropriate marketability and minority interest discounts, as calculated by applying standard appraisal practices and Internal Revenue Service Revenue Ruling 59-60.  However, these discount figures were created for purposes of evaluating the value of the Remaining Interest in 2004, not the value of the Remaining Interest in 2006 pursuant to the Third Sale.  Although both parties' experts were credible, the Court will **FIND** that the BRG Defendants' expert's seventeen percent minority interest discount and thirty-five percent marketability discount to be more persuasive as evidence of the appropriate discounts applicable to determining the value of the Remaining Interest (as in the hands of Austin) in 2006, and will **HOLD** that a judgment based on this discount is proper.  Accordingly, the Court will **ORDER** a judgment for recovery from the BRG Defendants to the Trustee pursuant to Bankruptcy Code § 550(a) as follows: $1.65 million reduced by (a) $280,500.00 (the seventeen percent minority interest discount) and (b) $479,325.00 (the thirty-five percent marketability interest discount, as calculated after backing out the seventeen percent minority interest discount), for an adjusted gross judgment value of $890,175.00.  This adjusted gross judgment value is then reduced by the $260,000.00 already paid by the BRG Defendants, for a total judgment value of $630,175.00.

## IV.  CONCLUSION

Accordingly, for the reasons set forth above, the Court will enter an Order of

Judgment contemporaneously with this Memorandum Opinion, ordering judgment consistent with the findings and holdings herein.


CHARLES E. RENDLEN, III

DATED:  October 30, 2008           CHARLES E. RENDLEN, III
St. Louis, Missouri                United States Bankruptcy Judge
mtc


Gregory Francis Hoffman
Millar, Schaefer, Hoffmann & Robertson
230 South Bemiston
Suite 1110
Clayton, MO 63105

Robert E. Eggmann
Copeland, Thompson et al.
231 S. Bemiston, Ste. 1220
St. Louis, MO 63105